UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 3:20-CR-00150 (KAD) |
| v. | |
| DENZEL SUGGS | April 23, 2021 |

MEMORANDUM OF DECISION
RE: DEFENDANT'S MOTION TO SUPPRESS (ECF NO. 34)

Kari A. Dooley, United States District Judge:

      Defendant Denzel Suggs ("Suggs" or the "Defendant") was charged by indictment on September 8, 2020 with unlawful possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Suggs filed a motion to suppress evidence of a firearm obtained during a warrantless search and seizure on the evening of July 31, 2020 pursuant to Fed. R. Crim. P. 12(b)(3)(C). Relying on two police reports from the evening in question as well as video footage obtained from the body cameras of two police officers, Suggs asserts that the firearm found on his person, specifically, his right front pants pocket, was seized in violation of the Fourth Amendment.[1] Suggs sought an evidentiary hearing on his motion. In response, the Government, as predicted, took the position that the evidence submitted and relied upon by the Defendant establishes that the search was reasonable under *Terry* and its progeny and because there were no disputed issues of fact, no evidentiary hearing was required. (ECF No. 46.) The Government urged the Court to resolve the motion on the submissions. However, after the Court heard oral

---

[1] For purposes of the motion to suppress, Suggs accepted as accurate the narrative contained in the police reports and, predicting that the Government would rely upon *Terry v. Ohio*, 392 U.S. 1 (1968), as the applicable exception to the warrant requirement, argued that *Terry* and its progeny do not countenance the search of his person as described in the reports.

1

argument on the Defendant's motion, the Government changed tack and moved for an evidentiary hearing so that the Government could offer testimony from the responding officers in order to expand the factual record. (ECF No. 72.) The Government also filed a supplemental memorandum of law, without seeking leave to do so, in which it advanced two arguments that were not explicitly advanced in its original opposition but which were identified explicitly at oral argument. (ECF No. 71.) The Defendant responded, opposing the Government's request for an evidentiary hearing as expressly waived and also addressing the two new arguments asserted by the Government. (ECF No. 76.) Because the Court concludes that the motion to suppress can be resolved on the current record, the Government's request for an evidentiary hearing is DENIED. For the reasons that follow, the motion to suppress is DENIED.[2]

**Background**

According to the narrative set forth in the Incident Report authored by Task Force Officer Frank Grillo ("Grillo") of the New Haven Police Department ("NHPD") (Def.'s Ex. 1, ECF No. 61), on Friday, July 31, 2020 at approximately 9:30 P.M., Grillo received information from a Confidential Informant ("CI") who reported that several male members of the "Exit 8" group were in possession of firearms at the Essex Townhouses located at 1134 Quinnipiac Avenue in New

---

[2] The Government also moved to seal the video evidence on the grounds that it might reveal the identity of potential witnesses in this matter, thereby raising safety concerns for these witnesses. The Government also asserts that because the videos include images of members of the public who were present during the events in question, there are privacy interests implicated by the public docketing of the footage. The Court advised the parties that the question of whether to seal the video footage would be based, at least in part, on the extent to which the Court relied upon the evidence in rendering its decision on the motion to suppress. In this vein, the Court concludes that the video footage is of limited probative value and it has not informed, in any substantial fashion, the Court's resolution of the motion to suppress. Further, the video evidence does include images of multiple private citizens who likely have nothing to do with this prosecution or the events leading up to Suggs's arrest. The citizens are easily recognizable given the quality of some of the footage and the Court sees no identifiable public interest in access to these images. Accordingly, the Government's motion to seal the video footage (ECF No. 47) is GRANTED. The Defendant's motion to seal (ECF No. 40), filed only because the reports and videos are protected material under the Court's standing orders, is moot in light of the granting of the Government's motion to seal and the fact that the police reports have since been filed on the public docket. (*See* ECF No. 61.)

Haven. The CI, who had proven reliable and credible in the past, including by providing information that led to prior firearms arrests, indicated that the group of males were standing immediately to the left of the entrance to the complex. Grillo relayed the CI's information to members of the NHPD's Criminal Intelligence Unit, Shooting Task Force, and Narcotics Enforcement Unit. Approximately 30 minutes later, at 10:01 P.M., the responding officers entered the parking lot of 1134 Quinnipiac Avenue in unmarked police vehicles. Assistant Chief Karl Jacobson ("Jacobson") activated the lights on his unmarked police vehicle to clear pedestrian traffic and alert the crowd to the presence of law enforcement. Jacobson recognized ten to fifteen members of "Exit 8," including Suggs, with whom Jacobson was familiar from having served Suggs with numerous Custom Notifications through Project Longevity.[3] After the officers exited their unmarked vehicles and approached the group of males who were standing to the left just past the entrance of the complex, some of the males, including Suggs, began to run and ignored officers' verbal commands to stop. Officer Grillo began to chase Suggs but lost sight of him in the crowd.

According to the supplemental report of Officer Joshua Castellano ("Castellano") (Def.'s Ex. 4, ECF No. 61), a tall male wearing a black t-shirt, who was later identified as Suggs, ran from the rear yard of a unit, and upon registering Officer Castellano's presence, immediately reached into his right pocket and turned and ran. Castellano called out to Suggs to stop running and began chasing him on foot with the assistance of Officer Cain. The foot chase continued throughout the complex and into a parking lot where Suggs ran around several parked cars, attempting to avoid capture. While pursuing Suggs Castellano observed him unsuccessfully attempt to pull an object from his right pants pocket several times, which Castellano believed was a firearm. He yelled "gun" several times to alert the other officers. Jacobson and another officer, Sergeant Werner

---

[3] As the Government explains in its opposition memorandum Project Longevity is a community and law enforcement initiative aimed at reducing gun violence in Connecticut's major cities.

("Werner"), eventually grabbed Suggs, who was still attempting to flee, when he ran through the parking lot where they were located. Castellano grabbed both of Suggs's arms and indicated to Jacobson that he believed Suggs had a gun on his person. Jacobson then reached into Suggs's right pants pocket and retrieved a small black handgun.

In his motion to suppress, the Defendant argues that the officers lacked reasonable suspicion to conduct an investigatory stop, and even if they had reasonable suspicion to stop him, the officers were required to conduct a pat-down search instead of choosing the more intrusive method of reaching directly into his pants pocket. Suggs therefore argues that Jacobson violated his Fourth Amendment rights, requiring suppression of the fruits of the illegal search and seizure. The Government responds that the circumstances surrounding the CI's information combined with Suggs's effort to evade law enforcement provided reasonable suspicion for the investigatory stop, and that the search was a valid extension of that stop consistent with *Terry v. Ohio*, 392 U.S. 1 (1968). At oral argument the Government also advanced two alternative arguments not explicitly briefed in its opposition: first, that the presence of exigent circumstances, coupled with probable cause to believe Suggs had a firearm, justified the warrantless search, and second, that even if the search of Suggs ran afoul of the Fourth Amendment, this Court should not suppress the evidence of the firearm under the inevitable discovery doctrine, given that, had the officers conducted a pat-down, the officers would have inevitably located and retrieved the firearm from Suggs's pocket.[4] Following oral argument the Government also submitted an unsolicited supplemental memorandum of law in which it expanded upon these two theories.[5]

---

[4] Although Suggs was arrested on July 31, 2020 for, *inter alia*, interfering with an officer in violation of Conn. Gen. Stat. § 53a-167a, the Government has not argued, and has eschewed any argument, that the inevitable discovery doctrine has application by virtue of a search incident to this arrest.

[5] Piecemeal litigation of a motion to suppress is, to be clear, disfavored. And the Government does not explain why it could not and did not timely raise these issues in its original opposition to the motion to suppress. However, because

**Standard of Review**

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"  *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (quoting U.S. Const. amend. IV).  "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is 'reasonableness.'"  *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). "In most cases, reasonableness requires a warrant and probable cause."  *United States v. Lifshitz*, 369 F.3d 173, 178 (2d Cir. 2004).  There are exceptions to the warrant requirement, however, and "[o]nce a defendant with a reasonable expectation of privacy in the area searched challenges a warrantless search as unreasonable under the Fourth Amendment, the burden is on the government to demonstrate that the search was within one of the recognized exceptions."  *United States v. Peña Ontiveros*, 547 F. Supp. 2d 323, 330 (S.D.N.Y. 2008), *aff'd sub nom. United States v. Rico Beltran*, 409 Fed. App'x 441 (2d Cir. 2011).

There are also exceptions to the probable cause requirement.  As relevant here, "police may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot, and may frisk him if they reasonably believe he is armed and dangerous." *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007) (citing *Terry*, 392 U.S. 1).  "Reasonable suspicion requires more than an 'inchoate and unparticularized suspicion or hunch.'" *Id.* (quoting

---

the Court does not reach these alternative arguments, herein concluding that the search was valid under *Terry v. Ohio*, 392 U.S. 1 (1968), the Court need not further address the Government's practice in this regard.  But the Government's shifting position on the question of an evidentiary hearing is equally troubling.  The Defendant sought to suppress the fruits of a **warrantless** search, placing the burden on the Government to establish an exception to the warrant requirement, which of course, would require evidence.  The Government, presumably, made a strategic decision to defend the search on the strength of the content of the police reports relied upon by the Defendant so as to avoid an evidentiary hearing.  It was only after having the benefit of oral argument that the Government revisited this decision and sought to reverse course, seeking the opportunity to offer additional evidence in the form of testimony from responding officers. This self-contradicting and easily avoidable prosecutorial approach has needlessly complicated the litigation and resolution of the Defendant's motion.

*Alabama v. White*, 496 U.S. 325, 329 (1990)).  Officers instead "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion on a citizen's liberty interest." *Id*. at 178–79 (quoting *Terry*, 392 U.S. at 21).  "In assessing the reasonableness of an officer's suspicion, [the Court] must take into account 'the totality of the circumstances' and must 'evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (quoting *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)).

The Fourth Amendment's reasonableness standard "governs not just the fact of the *Terry* stop but its scope." *United States v. McCargo*, 464 F.3d 192, 198 (2d Cir. 2006).  As with other aspects of a Fourth Amendment inquiry "[c]ourts assess 'reasonableness' in this context by 'balancing the particular need to search or seize against the privacy interests invaded by such action.'"  *United States v. Fiseku*, 915 F.3d 863, 870 (2d Cir. 2018) (quoting *United States v. Bailey*, 743 F.3d 322, 331 (2d Cir. 2014)).  "[A] protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'"  *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 26).  "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id*.  However "the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Bailey*, 743 F.3d at 340 (quoting *United States v. Sharpe*, 470 U.S. 675, 687 (1985)).

**Discussion**

    **Reasonable Suspicion**

In his motion the Defendant argues that the officers lacked reasonable suspicion to conduct an initial investigatory stop. The Court easily concludes that the totality of the circumstances justified the officers' reasonable suspicion that Suggs may have been engaged in criminal activity. The officers were acting on a credible tip, from a reliable informant, that members of the Exit 8 group were congregating at a specific location within the complex and that several of them had firearms. *See Elmore*, 482 F.3d at 179 ("Reasonable suspicion may be based upon information from a confidential informant so long as the tip bears sufficient 'indicia of reliability.'") (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1973)). The officers arrived at the scene within 30 minutes of the CI's tip and upon arrival, observed several males, including Suggs, at the precise location described by the CI. Jacobson recognized several of the males, to include Suggs, to be members of Exit 8.[6] *See, e.g.*, *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) ("In addition to considering an informant's veracity, reliability, and basis of knowledge, in assessing the totality of the circumstances we also evaluate whether the information an informant provides is corroborated by independent police investigation"). In addition, upon registering the presence of law enforcement, Suggs took off running and continued to try to evade capture, even after officers pursued him and called for him to stop running. *See United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006) ("When the noticed presence of officers provokes a suspect's headlong flight in a high crime area, the officers are justified in suspecting criminal activity on the part of the suspect

---

[6] Notwithstanding the Government's determination to oppose any evidentiary hearing, in its memorandum the Government recites additional facts that were not contained in the police reports—stating, for example, that the officers recognized Suggs from prior interactions and that Suggs had been arrested previously for selling drugs and possessing a firearm in the same location. (*See, e.g.*, Gov't's Mem. at 11, 17.) The Court confines its consideration of the facts to those statements set forth in the incident reports, as stipulated by the parties, and does not otherwise give cognizance to the Government's unsupported factual representations.

and a *Terry* stop is warranted"); *United States v. Jackson*, 548 F. Supp. 2d 24, 27 (W.D.N.Y. 2008) ("Unprovoked flight upon noticing police is pertinent in determining reasonable suspicion"). And while Suggs was running Castellano observed him reach for his right pocket several times in an apparent effort to grab hold of a concealed object, which, given the nature of the CI's tip, Castellano reasonably believed to be a firearm. *Cf. United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008) (concluding, where detective observed the defendant "reach underneath his jacket and shirt and adjust a weighty object concealed at the center of his waistline," that "[e]ven if the gesture were consistent with conceivable innocuous adjustments, its 'distinctive' consistency with the adjustment of a firearm provided the detective with a reasonable basis to suspect that [the defendant] was armed").

The Defendant argues that the mere fact that he ran from police during a chaotic situation involving the dispersal of a large crowd of people cannot establish reasonable suspicion, citing racial dynamics that he argues would naturally prompt an African American man to seek to avoid a confrontation with law enforcement. However here the officers were responding not only to their observation of Suggs's flight but also to the CI's information that individuals in Suggs's location and with whom Suggs was affiliated were in possession of firearms. Suggs's decision to run when the officers approached was therefore additional evidence that criminal activity was afoot – it was by no means the only basis for the stop. And after the chase began, Castellano observed Suggs several times attempt to pull an object from his pants pocket, further justifying the stop that eventually occurred. Under the totality of the circumstances, the officers had reasonable suspicion to believe Suggs may have been engaged in criminal activity. *See*, *e.g.*, *United States v. Torres*, 252 F. Supp. 3d 229, 235 (S.D.N.Y. 2017) (concluding that "because Torres (1) was present in a high crime area late at night and (2) fled from individuals whom he knew to be police officers, the officers had reasonable suspicion to make the stop" and observing that "[w]hile either factor alone

might not be enough to support a finding of reasonable, particularized suspicion, together they serve as facts sufficient to cross the threshold of reasonable suspicion to justify a stop") (internal citation omitted).[7]

**Reasonableness of the Search**

The Defendant next challenges the intrusiveness of the search after the officers stopped Suggs. Once restrained, Suggs argues that Jacobson was unjustified in reaching into Suggs's pants pocket, as he could (and should) have determined whether Suggs was armed by employing the less intrusive means of patting down his outer clothing, to include his pants pocket. Suggs relies on *United States v. Casado*, 303 F.3d 440 (2d Cir. 2002), where the Second Circuit held that an officer's search of the defendant's pocket violated the Fourth Amendment when the officer could have first conducted a pat-down to determine whether the defendant was armed.

In *Casado*, members of a police surveillance team observed the defendant exit a station wagon driven by a man named Felix Osso before entering an apartment building well-known for frequent drug sales. *See id*. at 441–42. One of the officers, Officer Storer, who had received news of this surveillance, approached Casado on foot after observing Casado emerge from the building and receive something from Osso, which Casado placed in his right front pocket. *See id*. at 442. Upon being confronted by police, Casado kept his hand in his pocket and Storer ordered him to remove it. *Id*. Casado did not comply and instead reportedly looked to his right and left, prompting Storer to draw his gun, point it at the defendant, and order him twice more to remove his hand from his pocket. *Id*. Casado still did not comply, and other officers from the team approached

---

[7] Suggs also points to the fact that another man at the gathering on July 31 took off running upon the arrival of law enforcement and was later discovered to be in possession of no illegal contraband, as demonstrated in the video footage documenting his interactions with the police. Suggs argues that the police thus created a chaotic situation that prompted certain individuals to run without reason or explanation. Even if Suggs is correct that the circumstances surrounding the arrival of law enforcement undermined the inference of criminal activity that can be drawn from Suggs's flight, this does not alter the ultimate conclusion that there was reasonable suspicion to believe that, for the reasons discussed above, Suggs was engaged in criminal activity.

9

Casado and Osso from behind. *Id.* As they took Osso into custody, Storer approached Casado, seized his right hand, pulled it away from his pocket and ultimately reached into the pocket without conducting a pat-down to remove its contents, which included a plastic bag of crack cocaine. *Id.* Casado was then indicted on charges relating to his cocaine possession. *Id.* at 443.

In assessing the reasonableness of Storer's search of Casado's pocket, the Second Circuit "assume[d] without deciding that Storer had a reasonable suspicion that Casado was in a position to 'gain immediate control of weapons.'" *Id.* at 447 (quoting *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)). However the Court of Appeals observed that at the second step of the *Terry* inquiry, "[t]here is no indication in the record that once Storer took Casado's hand out of the pocket, Storer could not have patted down the pocket to determine whether his fear of a weapon was justified, 'and then merely reached for and removed' any weapon had he found one there." *Id.* (quoting *Terry*, 392 U.S. at 30) (ellipsis omitted). Because this "less intrusive alternative of a frisk was obvious, commonly employed, and would have been effective to achieve the sole legitimate purpose for conducting such a search," the Second Circuit held that Storer's search of Casado's pocket was unreasonable and therefore violated the Fourth Amendment. *Id.* at 448. In his memorandum, Suggs argues that "this case involved exactly the same search that *Casado* declared unconstitutional nearly two decades ago." (Def.'s Mem. at 11, ECF No. 35.)

The Government argues that the circumstances present in *Casado* bear little resemblance to the rapidly evolving situation at issue here which, unlike *Casado,* involved an investigation into illegal firearms, not narcotics. The Court agrees with the Government.

Indeed, *Casado* itself articulates certain limiting principles that necessitate a different outcome here. First, the opinion recognized that "the question is not simply whether some other alternative to reaching inside Casado's pocket was available to Storer, but whether he acted unreasonably in failing to recognize or to pursue it." *Casado*, 303 F.3d at 448 (brackets omitted).

10

The Court of Appeals further "acknowledge[d] . . . the infinite variety of situations in which a police officer may confront a suspect whom the officer reasonably fears is armed and dangerous," and thus did "not exclude the possibility that in some circumstances a patdown is *not* required." *Id*. (footnote omitted) (emphasis added). The Court accordingly limited its holding to the record before it, concluding that Storer could have protected the officers' safety by opting for the less serious intrusion in the circumstances presented and that it was unreasonable for him not to do so. *Id*. at 448–49.

The same conclusion does not flow from the current record. There is no indication that Casado ran from law enforcement or engaged in any kind of physical struggle that would have rendered a pat-down untenable or ineffective in determining the presence of a firearm. As the Second Circuit observed, "Casado had made no sudden or violent movements at any point during the encounter." *Id.* at 448. Further, Casado was under investigation for a potential narcotics offense and there was no indication that there was any specific reason to believe he might have a firearm. As indicated, the Court had assumed for purposes of the analysis that Officer Storer had a reasonable suspicion that Casado was armed. Suggs, by contrast, was actively running from police in the moments leading up to the search and seizure, and according to Castellano's incident report, Jacobson and Werner "were able to grab ahold of Suggs who was still attempting to flee," at which point Castellano "forcefully grabbed both of Suggs['s] arms and informed Chief Jacobs[o]n that I believed he had a gun on his person," prompting Jacobson to reach into Suggs's pocket and retrieve the gun.[8] (ECF No. 61 at 15.) While a pat-down of Suggs's pocket may

---

[8] The Government asserts that the fact that Jacobson reached directly into Suggs's front right pocket supports the reasonable inference that Castellano told Jacobson not only that he believed Suggs had a gun on his person, but that he believed it was in the right front pocket. The Defendant disagrees that any such inference is reasonable. The Court need not resolve this dispute because even without drawing such an inference the Court has determined that the search was reasonable under the Fourth Amendment.

therefore have been available in theory, the Court cannot conclude that the more serious intrusion was unreasonable given the nature of the investigation (illegal firearms possession), the rapid pace with which the situation escalated, and the apparent threat to the officers' safety posed by Suggs's demonstrated interest in avoiding apprehension and his ongoing efforts in that regard. *See United States v. Samuels*, 131 F. App'x 859, 861 (3d Cir. 2005) (holding that firearm was lawfully discovered where officers reached directly for "bulge" in defendant's waist during a *Terry* stop in which the defendant failed to comply with officers' demands to keep his hands raised, as the officers' "limited intrusion" was "designed to address their immediate concerns regarding a possible threat to their safety," and rejecting defendant's argument that *Terry* required the officers to first conduct a pat-down); *United States v. Colon*, No. 97 CR. 449 (LMM), 1998 WL 122595, at *3–*4 (S.D.N.Y. Mar. 19, 1998), *aff'd*, 201 F.3d 433 (2d Cir. 1999) (concluding "that Mr. Colon's flight and the officers' awareness that Mr. Colon was carrying a long object under his coat—which, at the time, they easily could have assumed to be a gun—justified the officers' protective search of Mr. Colon" which consisted of retrieving firearm from the defendant's hip without first conducting pat-down, and observing that "Terry does not limit a weapons search to a pat down search").[9]  Notably, while Suggs had been grabbed by officers, he had not been handcuffed and it was only after the gun was seized that Suggs was handcuffed "without further incident." (ECF No. 61 at 15.)

---

[9] In *Casado*, the Second Circuit emphasized that none of the cases cited by the Government in which a protective search was upheld without first conducting a pat-down involved the search of a pocket specifically. *Casado*, 303 F.3d at 449 n.5. However the Court of Appeals reiterated its agreement "with the general principle that a patdown is not the only type of search authorized by *Terry*, and that there are circumstances in which a patdown is not required." *Id*. Although the Government here has not cited any case upholding the constitutionality of the direct search of a suspect's pocket in lieu of a pat-down, the Court does not discern a meaningful difference between reaching directly into a suspect's waistband and reaching into a pocket when officers are confronted with a quickly evolving and dangerous situation as was occurring in this case.

Indeed, the Supreme Court has long recognized that when conducting a *Terry* stop, officers are "authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop," *United States v. Hensley*, 469 U.S. 221, 235 (1985), and an "interest in officer safety has been the justification for *Terry* stops from their inception." *McCargo*, 464 F.3d at 200. *See also United States v. Aquino*, 674 F.3d 918, 926–27 (8th Cir. 2012) (citing *Casado* for the proposition that "[t]here are situations where concern for an officer's safety may justify by-passing a pat down during an investigatory detention" and distinguishing "a rapidly evolving situation where [the defendant] made a furtive gesture which may have given [the officer] reason to believe his safety was threatened by a readily accessible weapon" from situation where defendant was already in handcuffs at the time of the search and bypassing the pat-down was therefore unwarranted).

**Conclusion**

Although the Court appreciates that *Casado* limits the circumstances in which a protective search for weapons may reasonably bypass an initial pat-down, it does not foreclose the possibility that in certain instances, the need to react quickly to a rapidly intensifying and potentially dangerous situation may obviate the need for and indeed the utility of the less intrusive measure. The Court concludes that this is such a case. For this reason and for all of the foregoing reasons, the Defendant's motion to suppress is denied.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of April 2021.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE